**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez**

Civil Action No. 15-cv-1761-WJM-KLM

GREG A. RACE,
LEAF P. TREINEN,

      Plaintiffs,

v.

BOARD OF COMMISSIONERS OF THE COUNTY OF LAKE, COLORADO,
BRUCE HIX, in his individual capacity,
DOLORES SEMSACK, in her individual capacity,
JAMES MOYER,
ARLEEN T. RUGGERI, Deceased,
MOYER RANCH, LLC, a Colorado limited liability company,
LILLIE NELLIE AVI,
ARTHUR E. PEW JR., Deceased, and
ALL UNKNOWN PERSONS WHO CLAIM ANY INTEREST IN THE SUBJECT
PROPERTY,

      Defendants.

---

## ORDER ON SUMMARY JUDGMENT MOTIONS

---

Before the Court are two summary judgment motions. The first motion was filed

by Defendants Bruce Hix ("Hix") and Dolores Semsack ("Semsack"), who at all times

relevant to this lawsuit were members of the Lake County Board of Commissioners.

(ECF No. 84.) The second motion was filed by Defendant Board of Commissioners

itself, and by Defendants James Moyer and Moyer Ranch, LLC. (ECF No. 85.) For

clarity, the Court will refer to the Board of Commissioners, in its capacity as a Defendant

here, as "the County." At times the County's interests align with those of Hix and

Semsack, and in those circumstances the Court will refer to all three of them together

as "the County Defendants." The Court will refer to James Moyer and Moyer Ranch,

LLC, collectively as "Moyer."  Finally, when necessary, the County Defendants and Moyer will be referred to collectively as "Defendants."

For the reasons explained below, the Court holds that Plaintiffs waited too long to bring the key claim at issue here—an inverse condemnation claim—and all of their claims against the County Defendants therefore fail, save for a state-law claim under an open meetings statute.  In particular, the 42 U.S.C. § 1983 claim, on which this Court's jurisdiction is based, fails.  Given that only state-law claims remain (the open meetings claim and other claims against private citizens), the Court exercises its discretion under 28 U.S.C. § 1367(c) to remand the remainder of this case to Lake County District Court.

## I. FACTS

The following facts are undisputed unless attributed to a party.[1]

### A.    Plaintiffs' Property and the Road

Roughly five miles southeast of Leadville, Colorado, is a geographic promontory designated "Long and Derry Hill."  The Hill is part of a long ridge that descends mostly

---

[1] The undersigned's Revised Practice Standards require special formatting for summary judgment motions, in particular: that the movant set forth what it believes to be the undisputed facts in numbered paragraphs; that the respondent admit, deny, or state an evidentiary objection to, each of those numbered paragraphs; that the respondent set forth what it believes to be additional undisputed facts in numbered paragraphs; and that the movant address to the respondent's additional facts by admitting, denying, or stating an evidentiary objection.  *See* WJM Revised Practice Standard III.E.3–6.  Defendants' summary judgment motions adhere to the Practice Standard requirement, but Plaintiffs' two responses do not.  Specifically, Plaintiffs do not provide a paragraph-by-paragraph response to Defendants' factual assertions, but instead jump directly to their version of the story, presented in typical narrative form (*i.e.*, without numbered paragraphs).  Plaintiffs' failure in this regard frustrates the entire purpose of the undersigned's summary judgment Practice Standard, namely, to hone in on the precise facts in dispute.  The Court could, accordingly, deem Plaintiffs to have admitted all of Defendants' assertions of material fact.  As it turns out, most of the facts needed to decide Defendants' motions appear to be truly undisputed, and the facts over which there is an obvious dispute are immaterial.  The Court therefore makes no ruling at this time whether Plaintiffs should be deemed to have confessed any of Defendants' assertions.

westward from the summit of Mount Sheridan into the Arkansas River Valley.  To the north of the ridge is Iowa Gulch and to the south is Empire Gulch.

In the late 1800s, the United States granted numerous mining claims on Long and Derry Hill to private parties.  (ECF No. 85 at 5, ¶ 12.)  In 1999, Plaintiffs bought one of these mining claims, known as the "California Rose," on the southern face of Long and Derry Hill.  (ECF No. 94-1 ¶ 4.)  Plaintiffs have since purchased full or partial interests in other mining claims on the southern face.  (*Id.* ¶ 6.)  In the following exhibit prepared by a surveyor Plaintiffs hired for purposes of this lawsuit, Plaintiffs' claims are shown as red-shaded regions:



(ECF No. 94-2.)

Anyone traveling from the direction of Leadville who wishes to reach the southern face of Long and Derry Hill, including Plaintiffs, would generally travel eastward on Lake County Road 2 into Iowa Gulch (just north of the Hill), and from there take a short trip down Lake County Road 6A (a dirt road) until the turnoff for Lake County Road 6B (also a dirt road). Road 6B ascends, partly by switchbacks, up the north face of the western portion of ridge and eventually reaches a meadow at the crest of the ridge. In the exhibit reproduced above, Roads 6A and 6B are visible just below the Legend; the meadow at the crest of the ridge is just off the left side of the photograph.

At the meadow, the road branches in several directions, including eastward along the crest of the ridge. The eastward branch is the crux of this dispute, and the parties do not agree on its name. As will become clear below, the County insists that it is part of Road 6B. Plaintiffs deny this and refer to it simply as the "Upper Long and Derry Hill Road." For purposes of this Order, the Court will refer to it as the "Road."

The Road is visible in the exhibit reproduced above as the dirt road that begins on the left edge, a little below the horizontal center of the photograph, and snakes its way through trees in a northeasterly direction until it turns more-or-less straight eastward along the ridge towards the Houston Claim. At the Houston Claim, the Road turns southeast and starts to descend the south face of the ridge, but gradually bends eastward again, passing through some of Plaintiffs' claims and through stands of trees, eventually reaching the California Rose Claim. Although difficult to see in the above exhibit, the Road continues eastward from the California Rose Claim across the meadow, until it reaches the gap between two other stands of trees, which gap marks the beginning of United States Forest Service land. That last segment of the Road is

4

depicted in the following Google Earth photograph submitted—and annotated—by

Defendants:



(ECF No. 85-37.)

**B.** **The 2006 Road Action**

In 2000, Plaintiffs built a cabin on the California Rose Claim. (ECF No. 94-1 ¶ 5.)

Plaintiffs allege that, over the next few years, their "cabin was struck by gunfire multiple

times," their "windows were broken," and their "snowmobiles were stolen." (*Id.* ¶ 9.)

They further claim that Plaintiff Race was physically beaten by a number of men trespassing on his property.  (*Id.*)

Motivated by this, Plaintiffs say, they began putting a cable across the Road in 2004 (*id.* ¶ 10), apparently at the location marked with a green dot and the words "Private Property Sign" on ECF No. 94-2, reproduced above.  On September 28, 2005, the Lake County Board of Commissioners met in open session regarding Plaintiffs' obstruction of the Road.  (ECF No. 85 at 3, ¶ 5.)  Race attended that meeting.  (*Id.*) Defendants Hix and Semsack were not Board members at that time.  The Board instead comprised Kenneth Olsen, Michael Hickman, and Carl Schaefer (*see* ECF No. 85-4), none of whom are parties to this lawsuit.

The official meeting minutes summarize what appears to have been a tense and inconclusive discussion.  Those minutes read, in relevant part, as follows:

> Mr. Race explained that he has a cable across a road that the county has designated as County Road 6B and he has [erected] no trespassing signs. . . . Commissioner Olsen stated that [the Road] access[es] the national forest and he respectfully requested that Mr. Race open this road [considering that] its historic use is to [access] the national forest and to access other mining claims. . . .  Commissioner Olsen asked if [Race] was the one that put up the cable and Mr. Race replied in the affirmative.  He noted that he has done extensive research regarding the title to this land and he pointed out that [the location of his chain] is the termination of the public right-of-way.  Commissioner Olsen asked on what basis he makes that determination.  Mr. Race stated that this is based on . . . adverse possession . . . . Commissioner Olsen noted that [the Road] had been used open[ly] and adverse[ly] by the public for more than twenty years.[2]  Mr. Race responded that he could not find any claim of right.  Commissioner Olsen stated that the Board

---

[2] As will become clear in Part III.A, below, twenty years is the time period required in Colorado to create a public road by prescription.

6

> will proceed with what the Board needs to do with that road.
> Mr. Race stated that public use alone is not what defines
> adverse possession.  Commissioner Olsen stated that you
> can not adverse[ly] possess public [property] and this is the
> position that the county will take and the Board wanted to go
> over these items with Mr. Race.  Mr. Race understands the
> Board['s] concern and noted that he would ask the Board[']s
> assistance if someone lower down the road denied Mr. Race
> access to his property but private stuff is absolutely private.
> . . . Commissioner Olsen stated that the Commissioners
> have asked Mr. Race to remove the chain and his answer is
> no.  The county will proceed from here.

(*Id.*)

It took the County a little over a year to "proceed."  Specifically, on October 12 or

13, 2006, County employees removed all of Plaintiffs' obstructions and private property

signs they had placed on the Road ("2006 Road Action").  (ECF No. 85 at 4, ¶ 6; *see*

*also* ECF Nos. 85-7, 85-8.)

Later that same day, Plaintiffs replaced their obstructions.  (ECF No. 85 at 4,

¶ 6.)  Then, on October 15, 2006, Race submitted a written statement to the Lake

County Sheriff's Department complaining of vandalism and burglary of his fences and

signs committed by "a group of individuals, [traveling in] multiple vehicles, led by a red

Ford pickup with a stake bed with a Lake County Road and Bridge emblem."  (ECF No.

85-7 at 1.)  He continued, "No court of law has found my property, which was

vandalized, to be of the public domain, and this act constitutes an illegal 'takings.'"  (*Id.*

at 2.)

Race also wrote a letter to the Board, dated October 25, 2006, expressing his

indignation at the Board's "violation of my civil rights, without any due process."  (ECF

No. 85-8 at 1.)  "Have you read the takings clause in the Colorado Revised Statutes?"

he asked rhetorically.  (*Id.* at 2.)  "The attempt by this board to commandeer my

property by physical force at the hands of the Road and Bridge department is hurtful, illegal, in direct violation of Colorado law and clearly unconstitutional." (*Id.* at 3.)

**C.     The 2013 and 2014 Road Actions**

Apparently the parties were at a standstill for the next six years.  Then, according to Plaintiffs, "some time in 2012, Defendant Moyer [an adjoining landowner] began removing [Plaintiffs'] cable gate across the Road.  Each time the cable gate was removed, [Plaintiffs] reinstalled the cable." (ECF No. 95-25 ¶ 18.)  They "eventually began replacing the removed cable gates with a strand of barbed wire with a posted sign hanging from the wire." (*Id.*)

On November 1, 2013, the Board convened a special meeting to discuss the Road. (*Id.* ¶ 19.)  At the time, the Board comprised Defendants Hix and Semsack and non-party Michael Bordogna. (*Id.*)  At the end of the meeting, a "[m]otion was made by Commissioner Hix that Lake County recognizes 6B to extend to the boundary of the national forest" (ECF No. 95-33 at 3)—or in other words, through and beyond Plaintiffs' various claims.

On November 6, 2013, County employees again removed Plaintiffs' obstructions from the Road ("2013 Road Action"). (ECF No. 85 at 4, ¶ 9.)  Plaintiffs replaced them about a week later (*id.*), and then constructed a "solid metal gate" across the Road (ECF No. 95-25 ¶ 29).  "Defendant Moyer subsequently used a cutting torch to cut through and remove a portion of that gate." (*Id.*)

On October 2, 2014, County employees for a third time cleared Plaintiffs' obstructions from the Road ("2014 Road Action"). (ECF No. 85 at 5, ¶ 10.)  Plaintiffs claim that the 2014 Road Action was taken at the direction of Hix and Semsack without

complying with Colorado's open meetings laws.  (ECF No. 95-25 ¶¶ 32–33.)  In any event, Plaintiffs interposed additional obstructions about a week later (*id.*), and the Road remains obstructed to this day (ECF No. 95-25 ¶ 37).

## II. PROCEDURAL HISTORY

### A.     The Original Complaint & Motion to Remand

In July 2015, Plaintiffs filed suit in Lake County District Court against the County, Hix, Semsack, and James Moyer (but not Moyer Ranch, LLC).  (*See* ECF No. 4.) Plaintiffs asserted various property-related theories, including inverse condemnation, trespass, and quiet title.  (*Id.* at 4–7.)  Plaintiffs also asserted a claim for "Physical Entry and Damage – [42 U.S.C.] § 1983," allegedly in violation of both the Fourth and Fifth Amendments to the United States Constitution.  The Fourth Amendment component of the § 1983 claim was directed at the County's choice to "damage[], remove[] and destroy[] Plaintiffs' gate, cables, signs, locks, chains and hinges."  (*Id.* at 4, ¶ 33.)  The Fifth Amendment component of the § 1983 claim was directed at the allegedly unlawful taking of property "without notice or just compensation"; and also the alleged failure to provide Plaintiffs "due process in the creation of a public road."  (*Id.* at 5, ¶¶ 35–36.)

Based on these federal-law theories of relief, Defendants removed to this Court in August 2015.  (*See* ECF No. 1.)  The County Defendants then took the highly unusual step of moving to dismiss the § 1983 claim and requesting that, upon dismissal of that claim, the matter be remanded to Lake County District Court—the very court from which they chose to remove.  (*See* ECF Nos. 26, 27.)  The County Defendants based their motion on the so-called "*Williamson* requirement," which holds that a § 1983 claim under the Fifth Amendment for deprivation of property without just compensation

"is premature until it is clear that the Government has both taken property *and* denied just compensation." *Horne v. Dep't of Agric.*, 133 S. Ct. 2053, 2062 (2013) (citing *Williamson Cnty. Reg'l Planning Comm'n v. Hamilton Bank of Johnson City*, 473 U.S. 172, 186–87 (1985)) (emphasis in original).  Given that there had been no hearing on the propriety of the alleged taking, or on just compensation, the County Defendants contended that the *Williamson* requirement dictated dismissal of Plaintiffs' § 1983 claim as unripe.  (ECF No. 27 at 8–11.)  Furthermore, because the § 1983 claim is the only federal claim in this case, Defendants requested that the Court remand the remainder of the action to Lake County.  (*Id.* at 13–14; *see also* ECF No. 26 at 4.)[3]

The *Williamson* requirement is not jurisdictional, *see Stop the Beach Renourishment, Inc. v. Fla. Dep't of Envtl. Prot.*, 560 U.S. 702, 729 (2010), but is a matter of prudential ripeness only, *see Suitum v. Tahoe Reg'l Planning Agency*, 520 U.S. 725, 733–34 & n.7 (1997).  Thus, it is waivable, and this Court held that the County Defendants had indeed waived the *Williamson* requirement by removing to federal court based on the § 1983 claim.  (ECF No. 35 at 4–7.)  In the same order, the Court also ruled that Plaintiffs had a duty to join as defendants all landowners potentially affected by the Court's eventual disposition of the Road dispute.  (*Id.* at 9–17.)

## B.    The Amended Complaint

Plaintiffs then filed a First Amended Complaint (hereinafter, "Complaint"), which

---

[3] The County Defendants' motion to dismiss implicitly treated Plaintiffs' Fourth Amendment theory as subsumed within Plaintiffs' Fifth Amendment theory.  Or in other words, the County Defendants apparently presumed that Plaintiffs' Fourth Amendment theory based on seizure of their locks, chains, etc., would be disposed of one way or the other by an adjudication of whether a taking had occurred.  Plaintiffs' response brief did nothing to disabuse the County Defendants of this assumption.  (*See* ECF No. 29 at 1–4.)

added landowner-defendants Arleen T. Ruggeri, Moyer Ranch, LLC, Lillie Nellie Avi, Donnamarie Smith, Arthur E. Pew, and James A. McEachern. (ECF No. 41.) The Complaint alleges seven claims for relief, which may be summarized as follows:

1.  Inverse condemnation against the County.

2.  A claim under 42 U.S.C. § 1983 against the County, Hix, and Semsack, alleging violations of both the Fourth and Fifth Amendments. Plaintiffs' Fifth Amendment theory is simply the constitutional "backstop" claim that remains premature until the County fails to pay just compensation, as discussed above. As for Plaintiffs' Fourth Amendment theory, they assert that their right to be free from unreasonable seizures was violated when the "Lake County Road and Bridge Department, at the direction and instruction of the [County], Hix and Semsack, damaged, removed and destroyed Plaintiffs' gate, cables, signs, locks, chains and hinges." (*Id.* ¶ 33.) In other words, Plaintiffs are claiming compensation for the personal property seized when the County cleared Plaintiffs' obstructions.

3.  Violation of the Colorado Open Meetings Law, Colo. Rev. Stat. §§ 24-6-401 *et seq.*, alleging that the October 2014 Road Action was authorized by Hix and Semsack without holding a required public meeting.

4.  Common law trespass against the County and Moyer for "entering upon [Plaintiffs' property] and destroying Plaintiffs' gates and other improvements." (*Id.* ¶ 45.)

5.  Quiet title (under Colorado Rule of Civil Procedure 105) against all Defendants, including unknown persons who claim an interest in the

property.

6.      A request to enjoin the County and Moyer from entering on Plaintiffs'
property.

7.      Declaratory judgment (under Colorado Rule of Civil Procedure 57) "that
the [Road] is not a public road." (*Id.* ¶ 56.)

Defendants now seek summary judgment in their favor on all causes of action
asserted against them. No other party has moved for summary judgment.[4]

## III. ANALYSIS

### A.    Inverse Condemnation

Plaintiffs pleaded inverse condemnation as their first cause of action, and the
bulk of the parties' arguments are directed at attacking or defending this theory. The
County brings a number of arguments, including that the Road long ago became public
by operation of law under Colorado Revised Statutes § 43-2-201(1)(c) (declaring "all
roads over private lands that have been used adversely without interruption or objection
on the part of the owners of such lands for twenty consecutive years" to be public
highways) and under a federal enactment, Revised Statutes § 2477 (granting a general
right-of-way to construct highways across federal public lands).[5] The County also
argues that the statute of limitations has expired on Plaintiffs' inverse condemnation
claim. The Court agrees with this latter argument.

---

[4] The Clerk has entered a default against Lillie Nellie Avi, Arleen Ruggeri, and Arthur
Pew. (*See* ECF Nos. 73, 77, 79.) The Court dismissed James McEachern on Plaintiffs' motion.
(ECF No. 72.)

[5] Congress enacted Revised Statutes § 2477 through the Act of July 26, 1866, ch. 262,
§ 8, 14 Stat. 251, 253. Congress repealed it 110 years later, but that repeal preserved all roads
created in the meantime. *See* 43 U.S.C. § 1701.

1.   <u>Inverse Condemnation Generally</u>

The Colorado Constitution declares that "property shall not be taken or damaged, for public or private use, without just compensation."  Colo. Const. art. II, § 15.  Normally this provision is given effect through eminent domain proceedings instituted by a governmental entity to condemn a piece of private property.  However, sometimes a governmental entity takes private property without going through the eminent domain process, thus forcing the private landowner to bring "the mirror-image of an eminent domain proceeding," known as an inverse condemnation claim.  *Fowler Irrevocable Tr. 1992-1 v. City of Boulder*, 17 P.3d 797, 802 (Colo. 2001).  "Inverse condemnation and eminent domain actions both proceed under [the Colorado Constitution, art. II, § 15]."  *Id.*  Inverse condemnation is essentially an action "to compel the State to exercise its power of eminent domain."  *Thompson v. City & Cnty. of Denver*, 958 P.2d 525, 527 (Colo. App. 1998).  Colorado courts have described an inverse condemnation claim as comprising four elements: "(1) there has been a taking or damaging of a property interest; (2) for a public purpose; (3) without just compensation; (4) by a governmental or public entity that has the power of eminent domain, but which has refused to exercise that power."  *Scott v. Cnty. of Custer*, 178 P.3d 1240, 1244 (Colo. App. 2007).[6]

2.   <u>Statute of Limitations</u>

In Colorado, "[a]ll actions against any public or governmental entity or any

---

[6] As to the fourth element, there is no dispute that a board of county commissioners in Colorado has authority to condemn land to create a county road.  *See* Colo. Rev. Stat. § 43-2-112(1) ("The board of county commissioners on its own initiative may lay out . . . any county road, and the board of county commissioners shall cause the county road supervisor of the respective county to survey the proposed road and make a written report to the board of county commissioners of the county, describing the proposed road to be laid out . . . and the portions of land of each landowner to be taken for that purpose . . . .").

employee of a public or governmental entity" must be brought "within two years after the cause of action accrues," "regardless of the theory upon which suit is brought." Colo. Rev. Stat. § 13-80-102(1)(h). This applies to inverse condemnation claims. *Bad Boys of Cripple Creek Min. Co. v. City of Cripple Creek*, 996 P.2d 792, 795–96 (Colo. App. 2000) (rejecting theory that general twenty-year adverse possession period should overcome two-year inverse condemnation statute of limitations). As with almost all civil causes of action in Colorado, an inverse condemnation accrues "on the date both the injury and its cause are known or should have been known by the exercise of reasonable diligence." Colo. Rev. Stat. § 13-80-108(1); *see also Bad Boys*, 996 P.2d at 796 (accrual of an inverse condemnation claim "may be decided as a matter of law" if "the undisputed facts clearly show that a plaintiff discovered, or reasonably should have discovered, the injury and its cause as of a particular date").

Here, the County told Plaintiffs in September 2005 that it considered the Road to be public and that it would act accordingly. Then, in October 2006, the County made good on its threat by clearing Plaintiffs' obstructions in the 2006 Road Action. Plaintiffs therefore knew by October 2006 that the County was exercising dominion over the Road, to the point of seizing and/or destroying Plaintiffs' obstructions, and the County believed it did not need to pay Plaintiffs anything for that alleged intrusion. Nothing further is needed to start the statute of limitations running for an inverse condemnation claim, the essence of which is an alleged taking of private property for public purposes where the governmental actor has failed to follow eminent domain procedures. Indeed, Race himself quickly accused the County of "an illegal 'takings'" (ECF No. 85-7 at 2) and directed it to "read the takings clause in the Colorado Revised Statutes" (ECF No.

85-8 at 2).  Thus, Plaintiffs needed to bring suit by October 2008, and never did so.

The County points out as much in its summary judgment motion.  (ECF No. 85 at 25–27.)  Plaintiffs respond by characterizing the County's argument as "nonsensical" and "farcical."  (ECF No. 95 at 31.)  Substantively, however, they offer two interrelated counterarguments:

> First, Plaintiffs make no claim for damages under any theory for the 2006 Road Action, as they are well aware that the statute of limitations for those actions has passed.
>
> Second, if the Road is found to be closed to the public, every time the County enters upon the Property and causes damages, a new taking and/or trespass occurs.  The 2013 Road Action occurred on November 6, 2013.  This action was filed on July 24, 2015. With regard to the 2013 Road Action and the 2014 Road Action, this action is timely.

(*Id.*)  These contentions—which entirely lack supporting authority—betray Plaintiffs' basic misunderstanding of their current situation.  The 2006 Road Action was not some sort of discrete, compartmentalized injury.  It was the beginning of a two-year period in which Plaintiffs needed to sue for just compensation, or at the very least sue to enjoin further intrusions.  Plaintiffs' failure to do so means that the County's entitlement to the Road became non-contestable in October 2008.  From that point forward, the Road was public (if it was not already public).  Plaintiffs themselves agree that, assuming the Road was public, "the County was legally authorized to remove the Plaintiffs' obstructions to travel over the Road."  (ECF No. 94 at 8.)  Thus, the County's subsequent Road Actions in 2013 and 2014 were done under the County's authority to keep a public road open for travel.[7]

---

[7] Notably, Plaintiffs have *not* argued that the County's apparent inaction between the 2006 and 2013 Road Actions had any effect on the statute of limitations.  Nor can the Court see

Accordingly, Plaintiffs' inverse condemnation claim fails as untimely.

3.  <u>Inapplicability of "Temporary Takings" Theory</u>

One of Plaintiffs' counterarguments quoted above contains a premise—"*if* the Road is found to be closed to the public" (ECF No. 95 at 31 (emphasis added))—that reveals an even deeper misunderstanding regarding their inverse condemnation claim. Bringing this misunderstanding to light is important to show why none of Plaintiffs' current theories of liability permit Plaintiffs to evade the statute of limitations. In particular, Plaintiffs have now asserted a "temporary takings" theory that they believe applies to the present situation. For the reasons explained below, it does not.

a.  *Plaintiff's Burden to Prove Damages*

As noted above (Part III.A.1), one of the elements of inverse condemnation that a private landowner must prove is a taking "without just compensation." *Scott*, 178 P.3d at 1244. This element further dictates that the private landowner "has the burden of proof with regard to establishing the existence of damages and the amount of [just] compensation therefor." *Troiano v. Colo. Dep't of Highways*, 463 P.2d 448, 451 (Colo. 1969).

On October 15, 2015 (two months after this case had been removed to federal court and two-and-a-half months after it was filed in state court), Plaintiffs exchanged their Rule 26(a)(1) initial disclosures. (*See* ECF No. 85-32.) In the "Computation of Damages" portion of those disclosures, Plaintiffs asserted and "estimate [that] the fair market value of the real property taken [is] $100,000.00." (*Id.* at 4.) Plaintiffs did not

how it should have any effect. The 2006 Road Action was an unmistakable exercise of dominion without invoking eminent domain. It was the precise scenario for which inverse condemnation exists. *See Thompson*, 958 P.2d at 527.

disclose how they reached this figure.

Discovery closed in this case on December 5, 2016 (*see* ECF No. 69), almost a year-and-a-half after the case was filed.  On that same day, Plaintiffs served supplemental disclosures with a different damages calculation.  (*See* ECF No. 85-35.) In particular, Plaintiffs newly characterized the County's alleged taking as a "temporary taking" and sought damages of $6,160, which Plaintiffs characterized as the "[c]ost to restore property to pre-taking condition."  (*Id.* at 2.)  They derived this cost from an "estimate provided by Craig Schreiber, d/b/a LandArt" (*id.*), whose estimate was attached to the supplemental disclosures (*see* ECF No. 85-36).  Plaintiffs' supplemental disclosures also stated, "Diminution in Value: Not Applicable."

In this context "Not Applicable" appears to be an admission that Plaintiffs know of no way in which their property value has been affected by the County's alleged taking. Plaintiffs forthrightly confirm as much in their summary judgment response brief: "Plaintiffs . . . have not produced evidence of diminution in value damages related to their real property because, based on their investigations, no such evidence exists. Based on their research, the County's actions have not impaired the monetary value of their real estate."  (ECF No. 95 at 27–28.)

      b.    *Plaintiffs' Theory of a "Temporary Taking" Compensable by Restoration Costs*

Despite their lack of diminution-in-value evidence, Plaintiffs insist that they may still claim as damages the value of their restoration costs for the allegedly "temporary taking."  (*Id.* at 28–29.)[8]

---

[8] The County argues that Plaintiffs should not be allowed to assert their restoration damages theory because, assuming such damages were somehow appropriate, Plaintiffs'

Under Colorado law, a "temporary taking" is just what it sounds like: the government takes over the property "for a definite period of time," and then departs. *Fowler*, 17 P.3d at 802. In *Fowler*, for instance, a city allowed its flood mitigation contractors to occupy a private parcel for twenty-six months. *Id.* at 799. When the contractors departed, they "left the surface of the [parcel] scarred with wheel tracks and piled with rocks, rubbish, and other waste material." *Id.* at 800. In that context, the Colorado Supreme Court held that the trial court had discretion to award "restoration costs" as one measure of just compensation for the temporary taking. *Id.* at 805.

No similar scenario exists here. How, then, do Plaintiffs fit this case into the "temporary taking" mold? Their argument is as follows:

> Logically . . . this action can only ever be a temporary taking: Plaintiffs and Defendants agree that this action hinges, almost exclusively, on the issue of whether the Road is open to the public. If the Court finds that the Road is public, Plaintiffs essentially have no taking, inverse condemnation, or trespass claims, since the Defendants' entry onto and clearing of the Road were proper. . . .
>
> However, if the Court finds the Road is not open to the public, then there has been a temporary (and only a temporary) taking. This is because the Court's order finding the Road not to be public will return undisputed ownership of the Road to Plaintiffs. Defendant County's taking will consist of those actions the County took affecting the Property prior to the Court's order. After the Court's order, the Property and Road will be uncontestably owned by Plaintiffs.

(ECF No. 95 at 29.)

---

estimator—"Craig Schreiber, d/b/a LandArt"—would be presenting expert testimony, yet Plaintiffs never disclosed Schreiber as an expert and in fact disclosed him for the first time in any capacity on the final day of discovery. (ECF No. 85 at 22–24.) Given that the Court is disposing of Plaintiffs' inverse condemnation on other grounds, the Court need not reach this argument.

Plaintiffs' argument betrays a fundamental misconception about inverse condemnation. Inverse condemnation is not some sort of quiet title procedure by which a private landowner can eject the government. The essential purpose of inverse condemnation is to force the government to buy out the landowner. A plaintiff may not plead inverse condemnation in good faith without being prepared to accept just compensation in exchange for his or her property. Of course there may be factual nuances, such as in *Fowler*, where the city apparently had no intent of letting its flood mitigation contractors set up shop permanently on the plaintiff's property. But the basic character of the action remained the same: the government had the *right* to occupy the property for public purposes but needed prompting to fulfill its corresponding *duty* of just compensation.

Plaintiffs' confusion apparently arises from the County's choice to oppose Plaintiffs' claim through, among other things, an affirmative defense that the Road had become public long before Plaintiffs purchased their claims on Long and Derry Hill. In other words, the County took aim at the first element of Plaintiffs' inverse condemnation case, *i.e.*, that "there has been a taking or damaging of a property interest." *Scott*, 178 P.3d at 1244. After all, if the Road was public before Plaintiffs purchased their claims, then the County did not "take" anything from Plaintiffs when it acted to preserve the Road's public character.

From Plaintiffs' perspective, the County's strategy means that if they can defeat the County's affirmative defense, they win the road:

> Defendants assume that by proceeding in inverse
> condemnation, Plaintiffs are admitting that at the end of the
> inverse condemnation action, the Road will be public. That

is not the case. Defendant County has not asserted an
affirmative claim to declare the Road to be public. As such,
if the Court determines the Road is not public despite the
County's . . . affirmative defenses, then the Road will remain
private property.

(ECF No. 95 at 33.) Plaintiffs describe the County's contrary position as "simply

confused" (*id.*), but essentially every portion of Plaintiffs' argument shows that the

confusion lies with them.

Plaintiffs are correct on the lone point that private property does not become

public at the *end* of an inverse condemnation proceeding. Instead, an inverse

condemnation claim assumes that the property in question *has already become public*,

leaving only just compensation to be worked out. That is the essence of inverse

condemnation. It is thus immaterial that the County "has not asserted an affirmative

claim to declare the [R]oad to be public"; the now-public nature of the Road is implicit in

the inverse condemnation claim itself.[9]

---

[9] This is not a case in which the County is only willing to enforce the allegedly public
nature of the Road if a court agrees that the Road long ago became public by operation of law.
*Cf. Bd. of Cnty. Comm'rs for Garfield Cnty. v. W.H.I., Inc.*, 992 F.2d 1061, 1062–63 (10th Cir.
1993) (county brought declaratory judgment action to establish that a road had become public
under Colo. Rev. Stat. § 43-2-201(1)(c), but abandoned any right to the road when the district
court ruled against it). Stated somewhat differently, Plaintiffs threw down the inverse
condemnation gauntlet and the County took it up. To be sure, the County is unwilling to
characterize any of its actions as causing a taking because it believes that the Road has long
been public. The County's position nonetheless is clear: the Road is public now and will remain
public in the future, whether or not it was public beforehand. (*See* ECF No. 85 at 30 ("The Road
is public [because it became public long ago by operation of law], or it is public by virtue of
Plaintiffs' assertion that it was inversely condemned."); ECF No. 99 at 7 ("if the [R]oad was not
public before Plaintiffs claimed it was taken . . . , it was public after it was taken").) The County
has litigated with the understanding that it will probably be required to do so if its affirmative
defenses fail. (*See, e.g.*, ECF No. 90 at 12–13 (Final Pretrial Order summarizing the County's
position on the form of trial: "If the court finds in Plaintiffs' favor on the inverse condemnation
claim, the court will need to appoint at least three commissioners of freeholders from Lake
County to try the compensation phase of the inverse condemnation claim [pursuant to Colo.
Rev. Stat. § 38-1-101(2)(a)].").)

Further, and specifically relevant to Plaintiffs' statute-of-limitations problem, Plaintiffs' "temporary takings" theory also seems to be motivated by the Colorado Court of Appeals's statement that "[p]ublic roads may be created by deed, dedication, a rule and order entered in an eminent domain proceeding, or by court decree when past public use justifies such declaration." *Williams v. Town of Estes Park*, 608 P.2d 810, 812 (Colo. App. 1979). Plaintiffs interpret this to mean that "a Board of County Commissioners is empowered to create a public road in only four ways" and that "[a] Board of County Commissioners does not have the authority to declare a road to be public through resolution or ordinance." (ECF No. 95 at 7.) In this case, Plaintiffs say,

> there is no deed or dedication of the Road, and the County has chosen not to proceed through rule and order of eminent domain. So until a court enters a decree stating that the Road is open to public travel . . . , the Road remains private, even despite the County's attempt to declare the Road to be public . . . .

(*Id.*)

The *Williams* decision does not speak in exclusive terms (*e.g.*, "only four ways"), so Plaintiffs' initial premise is arguable. Regardless, Plaintiffs once again take a small portion of correct reasoning and apply it under a fundamental misunderstanding of the inverse condemnation claim they have brought.

The correct portion of Plaintiffs' reasoning is that a "court decree" is necessary to establish that a road has become public through "past public use" under Colorado Revised Statutes § 43-2-201(1)(c). *Williams*, 608 P.2d at 812. In other words, a county may not simply declare its belief that a certain road has become public under § 43-2-201(1)(c) and thereby bind the affected landowners—and the Court presumes the same to be true for the other statute under which the County argues, Revised Statutes

21

§ 2477. But the County has never argued that it bound the Plaintiffs and eliminated all potential recourse when it announced its belief that the Road had become public by operation of law. Rather, the parties have spent much of this lawsuit developing evidence to support or refute the County's belief.

If the County's position is wrong, the County has nonetheless been acting since October 2006 as if it has exercised eminent domain without actually going through the eminent domain procedures—the very scenario for which the inverse condemnation cause of action exists. Assuming Plaintiffs had timely brought an inverse condemnation claim, the Court's resolution of that cause of action would have provided the functional equivalent of the "rule and order entered in an eminent domain proceeding" called for in *Williams*. *See* 608 P.2d at 812.[10] But Plaintiffs did not timely bring such a claim. Therefore, as of October 2008, Plaintiffs lost their right to contest the County's claim of public right in the Road. At least vis-à-vis Plaintiffs, the Road is now public, if it was not public before.

**B.     Fourth and Fifth Amendment Claims (§ 1983)**

Plaintiffs assert a § 1983 claim for violation of the Fourth and Fifth Amendments. The Court will first address the effect of its timeliness ruling on Plaintiffs' Fifth Amendment theory. The Court will then turn to Plaintiffs' Fourth Amendment theory, which presents a thornier issue.

---

[10] *Williams* had no occasion to consider inverse condemnation because it was not at issue there. Nonetheless, as already discussed, inverse condemnation is an action essentially meant "to compel the State to exercise its power of eminent domain." *Thompson*, 958 P.2d at 527.

1.      Plaintiffs' Fifth Amendment Theory

As noted previously (Part II.A), a § 1983 claim based on an uncompensated taking in violation of the Fifth Amendment is premature until the state-law process for claiming just compensation has been exhausted and the government continues to deny compensation.  *Horne*, 133 S. Ct. at 2062.  In fact, the statute of limitations does not begin to run on a § 1983 takings claim until state procedures have concluded.  *See, e.g.*, *Corn v. City of Lauderdale Lakes*, 904 F.2d 585, 587–88 (11th Cir. 1990). Plaintiffs' Fifth Amendment claim is therefore still timely, technically speaking, because Plaintiffs' inverse condemnation claim remained unresolved until this Order.  However, the Court agrees with various other courts which have held that a party who fails to timely pursue state-law just compensation remedies has forfeited any Fifth Amendment takings cause of action.  *See, e.g.*, *Pascoag Reservoir & Dam, LLC v. Rhode Island*, 337 F.3d 87, 93 & n.6 (1st Cir. 2003); *Gamble v. Eau Claire Cnty.*, 5 F.3d 285, 286 (7th Cir. 1993).  Accordingly, Plaintiffs have forfeited their Fifth Amendment takings claim because they failed to timely pursue an inverse condemnation claim under Colorado law.

2.      Plaintiffs' Fourth Amendment Theory

Plaintiffs' two complaints filed in this lawsuit articulate their Fourth Amendment theory in terms of "the right against unreasonable seizure of real and personal property," referring to the "gate, cables, signs, locks, chains and hinges" that the County's employees "damaged, removed and destroyed."  (ECF No. 4 ¶¶ 33–34; ECF No. 41 ¶¶ 33–34.)  The County Defendants, against whom this theory was asserted, understood it simply as another way of seeking compensation for the County's alleged

taking, and ultimately subsumed within the Fifth Amendment theory. (*See* ECF No. 84 at 14–15.)[11] The Court's own exposure to the early proceedings in this case similarly led the Court to understand that the Fourth Amendment claim was duplicative, and the Court was expecting to see an eventual motion to dismiss or for summary judgment on those grounds.

For the first time in their close-of-discovery supplemental disclosures, Plaintiffs set forth a new category of allegedly destroyed property, namely, "sections of buck and rail fence" destroyed during both the 2013 and 2014 Road Actions, valued at a collective total of $84.00. (ECF No. 85-34 at 14.) Then, in Plaintiffs' summary judgment response brief, it became clear that the buck and rail fence claim was actually a prelude to an additional theory of Fourth Amendment relief. Plaintiffs there claimed, for the first time, that the County had seized and destroyed Plaintiffs' personal property away from the Road, such as portions of "buck and rail fence running along the edge of the Road, but not obstructing the Road in any manner, and numerous of Plaintiffs' 'private property' and similar signs. Some of the fences and signs . . . were up to 30′ off the course of the Road." (ECF No. 95 at 5.)

Defendants characterize this as a "belated effort to amend the complaint." (ECF No. 96 at 2.) The Court agrees. Theories not adequately raised in the complaint, especially if raised for the first time in a summary judgment response brief, are disfavored. *See, e.g.*, *Lawmaster v. Ward*, 125 F.3d 1341, 1346 n.2 (10th Cir. 1997); *Evans v. McDonald's Corp.*, 936 F.2d 1087, 1091 (10th Cir. 1991). If a "late shift in the thrust of the case" would "prejudice the other party in maintaining his defense upon the

---

[11] *See also supra* note 3.

merits," the new theory will be ignored. *Id.* (internal quotation marks omitted).  Here, Defendants had no notice that Plaintiffs were claiming destruction of personal property to the side of the Road.  They therefore had no opportunity to explore that possibility in discovery and to prepare a defense.  Thus, Defendants would be prejudiced if Plaintiffs could now maintain this new version of their Fourth Amendment theory, and the Court ignores it.

In that light, there is no independent Fourth Amendment claim to assert based on the facts of this case.  Plaintiffs' Fourth Amendment claim therefore fails.[12]

## C.    Other Claims Against the County Defendants

Plaintiffs' failure to bring a timely inverse condemnation claim has consequences for most of their other claims asserted against the County Defendants (*i.e.*, the County, Hix, and Semsack).

To begin, Plaintiffs' trespass claim against the County fails.  Plaintiffs make clear that they are not seeking damages "for the County's 2006 or 2013 [Road Actions]." (ECF No. 85-35 at 3.)  Thus, only the 2014 Road Action is at stake.  But Plaintiffs lost the right to contest the County's claim of public right in the Road in October 2008.  By Plaintiffs' own admission, the County has a right to clear obstructions on public roadways.  (*See* ECF No. 94 at 8 ("If the Road is open to public travel, then the County was legally authorized to remove the Plaintiffs' obstructions to travel over the Road.").) Thus, the County was acting within its rights during the 2014 Road Action, and no

_____

[12] Because Plaintiffs' Fourth and Fifth Amendment claims fail outright, the Court need not address Hix's and Semsack's arguments for absolute and qualified immunity.  (*See* ECF No. 84 at 9–18.)

trespass claim can succeed.[13]

Next, Plaintiffs assert claims of quiet title, "injunction," and declaratory judgment. All of these claims rest on the contention that the Road is private, contrary to the County's claim. But again, the Court has found that the Road is public, at least as between the County and Plaintiffs. Thus, assuming that any of these causes of action is compatible with an inverse condemnation claim (which is doubtful), these claims fail on their merits.

**D.    The Remainder**

The foregoing rulings do not address Plaintiffs' trespass claim against Moyer— the Court notes that Moyer is a private citizen, not a governmental actor, and no party has discussed the right of a private citizen in Colorado to destroy another citizen's property when it is obstructing a public roadway. The foregoing rulings also do not address Plaintiffs' Colorado Open Meetings Act claim against the County. Finally, the foregoing rulings do not address Plaintiffs' claims for quiet title and declaratory judgment against Moyer and the other private citizens who have been joined as Defendants (Ruggeri, Avi, and Pew, all of whom are in default).

None of these remaining claims could sustain original federal jurisdiction: they do not arise under federal law, so federal question jurisdiction is unavailable, *see* 28 U.S.C.

---

[13] The County Defendants argue that Plaintiffs' trespass claim fails for another reason, apart from the timeliness of their inverse condemnation lawsuit. The Colorado Supreme Court has held that inverse condemnation and trespass are mutually incompatible and may not be pleaded in the same action. *Ossman v. Mountain States Tel. & Tel. Co.*, 520 P.2d 738, 741 (Colo. 1974) (although a party "may elect at the outset whether to proceed in trespass or inverse condemnation," the requirement that just compensation be fixed by a jury of freeholders, unlike in a common law claim, means that "an inverse condemnation claim cannot be litigated in the same lawsuit with a common law claim"). Given the disposition above, the Court need not explore the scope of this rule.

§ 1331; and all parties to this case are Colorado citizens or entities, so diversity jurisdiction is likewise unavailable, *see id.* § 1332(a).  This Court therefore has discretion to dismiss the remaining claims.  *See* 28 U.S.C. § 1367(c)(3).  Whether to dismiss or keep these claims is a "multifactorial analysis" that includes consideration of matters such as judicial economy, convenience, fairness to the litigants, the nature and extent of pretrial proceedings, and any particular circumstances of the case at hand. *Olcott v. Del. Flood Co.*, 76 F.3d 1538, 1550 (10th Cir. 1996).

On the one hand, nearly all pretrial proceedings in this case have taken place in this Court, and this matter is set for trial at the end of September 2017.  In many cases this might counsel in favor of keeping jurisdiction.  However, disputes over real property are quintessentially local.  *Cf. Dibbs v. Hillsborough Cnty.*, 67 F. Supp. 3d 1340, 1355 (M.D. Fla. 2014) (declining to exercise jurisdiction over a zoning dispute after dismissing the plaintiff's § 1983 claim), *aff'd*, 625 F. App'x 515 (11th Cir. 2015); *Warden v. City of Grove*, 44 F. Supp. 3d 1098, 1109 (N.D. Okla. 2014) (similar), *aff'd*, 604 F. App'x 755 (10th Cir. 2015); *Achtien v. City of Deadwood*, 814 F. Supp. 808, 819 (D.S.D. 1993) ("Where all the claims over which a district court had original jurisdiction have been dismissed, and where the state law claims within a court's supplemental jurisdiction involve questions of zoning authority under municipal ordinances, it is particularly appropriate for a court to exercise its discretion to dismiss the state law claims."). Disputes under the Colorado Open Meetings Law are of significant concern primarily only in state court.  *Cf. Detroit Mem'l Park Ass'n, Inc. v. City of Detroit Bd. of Zoning Appeals*, 105 F. Supp. 3d 769, 778–79 (E.D. Mich. 2015) (at the pleading phase, declining to exercise supplemental jurisdiction over a state-law open meetings claim).

Moreover, it appears that every party and nearly all potential witnesses are Lake County residents.

Considering all of this, the Court finds that the most appropriate venue for the remainder of this action is Lake County District Court. The Court will therefore remand to that court all of those claims over which it has not ruled on the merits.

## IV. CONCLUSION

For the reasons set forth above, the Court ORDERS as follows:

1. Defendants Bruce Hix and Dolores Semsack's Combined Motion for Summary Judgment (ECF No. 84) is GRANTED;

2. Defendants Board of County Commissioners, Moyer and Moyer Ranch, LLC's Motion for Summary Judgment (ECF No. 85) is:

   a. GRANTED with respect to Plaintiffs' first claim for relief (inverse condemnation), second claim for relief (§ 1983), fourth claim for relief (trespass) as asserted against the Board of County Commissioners; fifth claim for relief (quiet title) as asserted against the Board of County Commissioners; sixth claim for relief (injunction) as asserted against the Board of County Commissioners; and seventh claim for relief (declaratory judgment) as asserted against the Board of County Commissioners; and otherwise

   b. DENIED WITHOUT PREJUDICE to reassertion in state court;

3. The Final Trial Preparation Conference scheduled for September 8, 2017, and the Bench Trial scheduled to begin on September 25, 2017, are VACATED;

4. Plaintiffs' Motion *in Limine* to Determine Burden of Proof and Strike Untimely

Disclosed Witnesses (ECF No. 103) is DENIED AS MOOT;

5.    The Clerk shall ENTER FINAL JUDGMENT in favor of the Board of County

      Commissioners, Bruce Hix, and Dolores Semsack on Plaintiffs' first, second,

      fourth, fifth, sixth, and seventh claims for relief;

6.    The Clerk shall REMAND all matters not disposed of by final judgment to the

      Lake County District Court; and

7.    The Board of County Commissioners, Bruce Hix, and Dolores Semsack shall

      have their costs upon compliance with D.C.COLO.LCivR 54.1.


      Dated this 4th day of August, 2017.

                                              BY THE COURT:


                                              _____
                                              William J. Martinez
                                              United States District Judge